IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE TRAVELERS HOME AND MARINE INSURANCE CO., | ) ) | |
| Plaintiff, | ) ) | |
| vs | ) ) | Civil Action No. 10-931 |
| KEITH LISTON, et al., | ) ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

Plaintiff, The Travelers Home and Marine Insurance Company ("Travelers"), brings this action seeking a declaratory judgment that it owes no duty to defend or indemnify Defendant Keith Liston ("Liston") with respect to any lawsuit that may be filed against him arising out of the death of Dr. Praveen Jammula, who drowned in a swimming pool at property owned by Liston on May 23, 2009. Also named as defendants are Ambika Jammula (Dr. Jammula's widow), individually and as administratrix of the estate of Praveen Jammula, and Dr. Jammula's two minor children, Anirudh R. Jammula and Sahitya N. Jammula. Since the filing of this case, an underlying lawsuit has been filed on behalf of Dr. Jammula and his heirs against Liston and others in the Court of Common Pleas of Westmoreland County. Travelers notes that it has provided a defense to Liston in that action pursuant to a reservation of rights.

Currently pending before the Court for disposition is a motion for summary judgment, filed by Travelers. For the reasons that follow, the motion will be denied.

Facts

Liston was at all times relevant to this suit a chiropractor with an office at 1259 University Drive in Dunbar, Pennsylvania. (Liston Examination Under Oath ("EUO") at 20-

26.)[1]  Along with the rental of 1259 University Drive for his practice, Liston also owned two properties at all times relevant to this lawsuit: 144 Old Franklin Road in Donegal, Pennsylvania (the "Donegal Property") and 571 Bitner Road in Dunbar, Pennsylvania (the "Bitner Road Property").  (Liston EUO at 42-43.)  Liston purchased the Donegal Property in June 2006 from the Estate of Sullivan D'Amico, for the amount of $550,000.00.  (Liston EUO at 43.)

To finance the purchase of the Donegal Property, Liston took out mortgages in the collective amount of approximately $480,000.00 on the house.  (Liston EUO at 43, 57.)  Liston's original purpose in purchasing the house was to live in it for a few years with his girlfriend, Amanda Smith ("Smith"), and then "flip it" for a profit.  (Liston EUO at 44; Giese Dep. at 31.[2]) The Bitner Road Property was purchased by Liston "as just a flip," part of Liston's business of flipping houses.  The renovations to that house were not done for him and Smith to live there. (Giese Dep. at 60.)

For the period of time prior to October 2008, Liston and Smith would stay at the Donegal Property the majority of the time, including nights.  (Giese Dep. at 26-27.)  Beginning in October of 2008, Liston decided to begin renting the Donegal Property. (Liston EUO at 48-49; Giese Dep. at 24, 106.)

Liston stated that the reason he began to rent the house was to help "lessen the burden of the house."  (Liston EUO at 49, 73.)  One of their friends said it would be a great way to make money.  (Giese Dep. at pages 31-32, 39.)

Liston and Smith stated that, when they began to rent the Donegal Property, they would move out of it while renters were present, but would stay there when renters were not present.

---

[1] Travelers App. (ECF No. 39) Ex. A.
[2] ECF No. 39 Ex. B.  Smith is now married and her name is Amanda Giese.  (Giese Dep. at 5.)

They took pictures, most of the clothing and food with them.  They kept some clothing, toiletries and personal items in a locked closet; other clothes would be placed at the Bitner Road Property.  Furniture and appliances were not moved.  (Liston EUO at 58-59, 72-73; Giese Dep. at 27, 56, 76-77, 94-95.)

On the days renters were not at the Donegal Property, Liston and Smith would spend most of their days and nights there, although they would also stay at the Bitner Road Property.  (Giese Dep. at 25-28.) Smith stated that, in the beginning (winter of 2008), the Donegal Property was only rented on weekends and she and Liston would stay there during the week, although she did not like staying at the Donegal Property and tried to avoid doing so whenever possible.  (Giese Dep. at 27-28.)  She estimated that, of all the days that renters were not at the Donegal Property, she and Liston spent approximately 50% or less of those days at the Donegal Property.  They also spent time at the barn on the property, which was being renovated to be used as another rental property.  (Giese Dep. at 28-29.)

However, Liston stated that he stayed at the Donegal Property 99% of the time during the fall of 2008 and the winter of 2008/2009 and if it wasn't rented he was there.  (Liston EUO at 59-60.)  Moreover, when asked by Travelers' attorney to estimate the number of days that he spent at the Donegal Property in 2009, Liston responded as follows:

> Pretty much any time they're not here.  Because as soon as they would leave, we would go up that day.  So, like, say for instance, they would check out November 8th, we would go up there and clean that day.  We had a cleaning lady come up, and we'd just, you know, bring up clothes and things like that.  So pretty much all the other days ….  That's the day they checked out early in the morning before eleven o'clock, and we'd go there and clean, and we'd bring our stuff up and stay until the next person come in....  Unless it was a back-to-back rental.  Then we wouldn't.

(Liston EUO at 63-64.)

3

The mortgage and utilities for the Donegal Property were paid out of the bank account for Liston's chiropractic business. (Liston EUO at 107, 111-12; Giese Dep. at 44, 55.) Some supplies were paid for by Smith out of "whichever account had the most money at the time we would use that card," including her account, Liston's account, a joint account and his clinic account. (Giese Dep. at 43-44.) Smith would pay the expenses, bills and utilities for the Bitner Road Property out of her own personal account. (Liston EUO at 105-06; Giese Dep. at 45.)

To prepare the house for rental, Liston and Smith put pamphlets of local restaurants in their house, bought towels, extra dishes and silverware, and kept a locked closet with cleaning supplies and extra sheets. They also added bunk beds and additional mattresses to the house to accommodate additional sleepers. (Giese Dep. at 79-80.) With the additional mattresses added to the four already in the house, the property slept up to 18 people. (Giese Dep. at 80-81.)

Liston and Smith renovated a barn that existed on the Donegal Property to rent and market separately as a rental unit. The Barn renovation was finished by July of 2009. (Giese Dep. at 29-30.) The Barn on the Donegal Property was approximately 2,000 to 2,500 square feet, and contained two separate living areas, with two bedrooms and a bathroom for each living area. (Giese Dep. at 30.) An additional swimming pool—the second on the property—was installed near the Barn on the Donegal Property for the use of renters of the Barn. (Liston EUO at 114; Giese Dep. at 29-30; Crossland Dep. at 52.[3])

Smith was in charge of marketing the Donegal Property for rental, and of facilitating these rentals. (Liston EUO at 50, 60, 121-22.) To facilitate this, the Donegal Property was marketed on several websites that specialized in the marketing of rental and vacation properties,

---

[3] ECF No. 39 Ex. N.

including www.HomeAway.com as well as www.vacationrentals.com.  (Liston EUO at 50; Giese Dep. at 46.)  These websites provided access to five separate vacation rental marketing websites, at a cost of $300.00 a year.  (Giese Dep. at 46-47.)  Liston and Smith initially marketed the Donegal Property as "Majestic Mountain Estate," but then changed the name of the marketing title to "Back Acres Estate."  (Giese Dep. at 85-86)

The Donegal Property was rented on a day-to-day or weekly basis for vacationers; they did not offer long-term leases. (Giese Dep. at 106.)  To facilitate credit card transactions for the rental of the Donegal Property, a PayPal account was set up strictly for this purpose. (Giese Dep. at 87-88.)  This PayPal account was set up in the name of "Back Acres Estate" and was never used for any other purpose by Smith or Liston.  (Giese Dep. at 87-88; ECF No. 39 Ex. O.)

From the beginning of this rental period, there were no restrictions on rental dates—any date on the calendar was available for rental.  (Liston EUO at 67; Giese Dep. at 56-57.)  However, only short-term vacation rentals were offered, not month-to-month or long-term leases. (Giese Dep. at 106.)

Smith also created for the Donegal Property a "renter's handbook" that would be left in the Donegal Property as a reference for renters.  (Giese Dep. at 49-50.)  Travelers has attached to its Appendix a document similar to Smith's "renter's handbook," and it includes much of her original work. (ECF No. 39 Ex. E.)  Smith's version of the renter's handbook did say "Back Acres Estate" on it.  (Giese Dep. at 49-50, 54.)  Besides the renter's handbook, a series of pamphlets for local attractions and restaurants were left in the drawer in the kitchen for renters to utilize.  (Giese Dep. at 53-54.)

Once the Barn at the Donegal Property was completed, that began to be marketed separately from the main house.  Liston and Smith had separate accounts for the Barn as well as

the main house at the Donegal Property on www.HomeAway.com.  (Giese Dep. at 59.)  The

Barn was considered a cheaper rental alternative to the bigger house located on the Donegal

Property. (Giese Dep. at 59.)[4]  Furthermore, in July of 2009, Liston's brother Kevin or Kevin's

trainer came up with an idea to open a fitness facility/fitness boot camp on the Donegal Property,

although these plans never came to fruition. (Giese Dep. at 73-74.)

     The 2009 Corporate Tax for Liston Incorporated lists "Rental House-Donegal PA" under

Form 8825, "Rental Real Estate Income and Expenses of a Partnership or an S Corporation."

(ECF No. 39 Ex. C.)  All rental income and expenses were "claimed" on this 2009 Corporate

Tax Return of Liston Incorporated.  Liston Incorporated claimed, as deductible business

expenses for the Donegal Property, such items as cleaning the house, insurance premiums,

repairs, utilities, interest, and even traveling to and from the Donegal Property.  Liston's 2009

personal tax return shows a $40,022 loss under "Rental real estate, royalties, partnerships, S

corporations, trusts, etc." from Liston, Incorporated.  (ECF No. 39 Ex. D at 1, 4.)

     When the Donegal Property was first listed for rental in the fall of 2008, Liston hired a

cleaning woman, Beth Crossland, to help clean the property in between rentals of it.  (Crossland

Dep. at 12-15.)  When the Donegal Property was rented, Liston or Smith would contact

Crossland to come clean.  (Crossland Dep. at 13.)  Crossland would sometimes clean the

property alone, and sometimes with the help of Liston and/or Smith.  She received between $50

and $125 per cleaning. (Crossland Dep. at 13, 17-18.)  Crossland would only clean the Donegal

Property after renters checked out; she never cleaned the property after Liston and Smith stayed

there. (Crossland Dep. at 15, 17-18.)  In November of 2009, after rentals stopped, Liston stopped

---

[4] Defendants "deny" this statement (ECF No. 40 ¶ 36), but it is supported by the record and they
cite no contrary evidence.

contacting Crossland about cleaning the Donegal Property.  (Crossland Dep. at 21.)

The Donegal Property was always rented for money.  (Liston EUO at 67.)  Liston

indicates that all of the money from the rental of the Donegal Property was put back into the

property.  (Liston EUO at 123.)

As part of her responsibilities for rentals of the Donegal Properties, Smith kept a

spreadsheet of renters who rented the property, although she admitted it was not always 100%

accurate.  (Liston EUO at 60-61; Giese Dep. at 33; ECF No. 39 Ex. F.)  The first page of the

Rental Spreadsheet shows renters of the Donegal Property house.  The second page of the Rental

Spreadsheet shows renters of the finished Barn on the Donegal Property.  (Giese Dep. at 72.)

Liston did not have anything to do with this spreadsheet, as Smith was solely responsible for it.

(Liston EUO at 60-61.)

In response to inquiries for rental sent through one of the websites they marketed

through, Smith would have a form e-mail she would send in response. (Giese Dep. at 85-86; ECF

No. 39 Ex. L at 1-2.)  They also developed a standard rental contract to use with renters.  (Liston

EUO at 125; Giese Dep. at 82-83; ECF No. 39 Ex. M.)

Smith specifically remembers all of the renters that appear on the spreadsheet through the

end of August 2009 actually staying at the house, with the exception of the Stacy Renson party.

(Giese Dep. at 37-38, 103, 110-12.)  The last four rental parties on the first page of the Rental

Spreadsheet did not stay at the Donegal Property.  (Liston EUO at 120-21; Giese Dep. at 37-38,

98, 103, 110-12.)  On the Rental Spreadsheet, the first date listed for each individual rental party

was the date that party checked in, and the last date would be the date that individual party

checked out, with a check-in time of 3:00 p.m. or later and a check-out time of 11:00 a.m. or

earlier.  (Giese Dep. at 97-98, 101-02.)

From May 21 through May 25, 2009 (which was Memorial Day weekend), a party of twenty individuals rented the Donegal Property.  Included in this group was Dr. Praveen Jammula.  (ECF No. 39 Ex. M.)  Smith states that the Jammula party does not appear on the spreadsheet because they were a last-minute rental, though they did stay at the property during the 2009 Memorial Day Weekend.  (Giese Dep. at 35-37.)  Defendants note that the rental was paid by May 2, 2009, and thus they dispute that it was a "last-minute rental."  (Giese Dep. at 107; ECF No. 39 Ex. M at 3-4.)

On May 23, 2009, during his rental of the Donegal Property, it has been alleged that Dr. Jammula drowned in one of the swimming pools on the Donegal Property.  A lawsuit has been filed against Liston and others alleging, inter alia, that his acts or omissions somehow contributed to the death of Dr. Jammula on the Donegal Property. (ECF No. 39 Ex. P.)  As a result of Dr. Jammula's death and subsequent lawsuit, Liston has made a claim for liability coverage, defense and indemnity with the insurer of the Donegal Property, namely Travelers Insurance.

Liston did not submit this claim to Travelers until September 17, 2009, 4 months after the loss in question.  It was during this claims investigation that Travelers determined that the property was being rented.  Defendants note that Liston was not aware that a claim was being made by the Jammulas until he received a letter from their attorney dated September 15, 2009.  They also note that the Donegal Property was no longer being rented by September 2009.  (ECF No. 39 Ex. F; Liston EUO at 120-21)

The contract of insurance at issue, with Travelers, Policy No. 982823426 633 1, was issued on April 15, 2008, and was set for a contractual term of one year, that is, until April 15, 2009.  (ECF No. 39 Ex. G.)  The policy was renewed on April 15, 2009, for another year policy

term, that is, until April 15, 2010.  (ECF No. 39 Ex. H.)  The contract of insurance issued by

Travelers was a Homeowners Insurance Policy.  Travelers was sought out for an insurance

policy for Liston by his agent/broker, the John Fiesta Insurance Agency.  (Evans Dep. at 20-21.)[5]

John Fiesta agent Heidi Evans confirmed that Liston said "find me a good policy," and she did.

John Fiesta does not write only for Travelers.  (Evans Dep. at 20-21.)

Defendants note that the Policy provides the Donegal Property with the following

coverages: dwelling coverage of $587,000, personal property coverage of $410,900, other

structure coverage of $58,700 and loss of use of $176,000.  It also provides $500,000 in personal

liability coverage and $1,000 in medical payment to others.  (ECF No. 39 Ex. H at 2.)

There were no rentals of the Donegal Property from August 23, 2009 through the

remainder of the subject Policy period, April 15, 2010.  (Liston EUO at 117; ECF No. 39 Ex. F.)

Liston stopped renting the Donegal Property as a vacation rental after August 22, 2009 because it

got to be too much of a hassle.  (Liston EUO at 119.)

Defendants note that, during the 90-day period leading up to the Jammulas' rental of the

Donegal Property on May 21, 2009, at the most there were four rentals of the Donegal Property:

on February 19, 2009, a 3-night rental; in March 2009, there was only one 4-night rental (as

Stacey Renson's February 27, 2009 to March 1, 2009 rental cancelled); in April 2009 there was

only one 3-night rental and in early May 2009 there was only one 2-night rental.  (ECF No. 39

Ex. F; Giese Dep. at 112.)

Defendants contend that, at most during the first Policy year, April 15, 2008 to April 15,

2009, the Donegal Property was only rented for 42 days out of 365 days and that these were

---

[5] ECF No. 39 Ex. K.

nonconsecutive rental to different groups or individuals.  (Liston EUO at 140-41; Giese Dep. at 33, 38; ECF No. 39 Ex. F.)

Defendants contend that, during the Policy period at issue, April 15, 2009 through April 15, 2010, the Donegal Property was rented at the most 69 days out of 365 days and that they were nonconsecutive rentals to different individuals or groups.  (Liston EUO at 140-41; Giese Dep. at 33, 38, 112; ECF No. 39 Ex. F.)  They also state that the majority of the Donegal Property rentals were two-night or three-night rentals and the longest rental was an eight-night rental which only occurred one time.  (ECF No. 39 Ex. F; Giese Dep. at 106.)

Travelers responds that the property was rented for ninety (90) days out of the April 15, 2009 to April 15, 2010 policy period, which is at issue here. This represents twenty five percent (25%) of the time period.  Further, there are between nine and ten week-long or close to week-long, rentals reflected on the Smith's rental spreadsheet during this time period.

Procedural History

Plaintiff filed this action on July 15, 2010.  Jurisdiction is based on diversity of citizenship, in that Travelers is an insurance company based in Hartford, Connecticut; Liston is a citizen of Pennsylvania; the Jammulas are citizens of either Virginia or Illinois; and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.  (Compl. ¶¶ 1-6; ECF No. 39 Ex. P ¶¶ 1-2.)  On June 30, 2011, Plaintiff filed a motion for summary judgment.

Standard of Review

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts

10

sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty- Lobby, Inc., 477 U.S. 242, 248 (1986).

Travelers argues that: 1) there is an affirmative exclusion in the Policy that excludes coverage for any damage arising out of a business being conducted at the insured premises and Liston was running a sophisticated rental business from the Donegal Property (and not on an "occasional" basis such that an exception to the exclusion would apply); and 2) there is an affirmative exclusion in the Policy that excludes liability coverage for damages arising from a location that was not an "insured location" which is defined as the "residence premises," but Liston did not reside at the Donegal Property and only visited the location on a sporadic basis when it was not being rented.

Defendants respond that: 1) the rentals of the Donegal Property were only "occasional" because they were sporadic, irregular and short-term; and 2) Liston would leave temporarily during the rentals but always returned upon check-out as he continued to reside at the home between the rentals and thus the Donegal Property was the "residence premises" and the "insured location."

<u>Duty to Defend and Indemnify</u>

The Court of Appeals for the Third Circuit recently reiterated that:

It is the function of the court to interpret insurance contracts under Pennsylvania law. <u>Melrose Hotel Co. v. St. Paul Fire & Marine Ins. Co.</u>, 432 F. Supp. 2d 488, 495 (E.D. Pa. 2006) (citing <u>401 Fourth St., Inc. v. Investors Ins. Grp.</u>, 583 Pa. 445, 879 A.2d 166, 171 (Pa. 2005))  The court's primary consideration in performing this function is "'to ascertain the intent of the parties as manifested by the language of the written instrument.'" <u>Home Ins. Co. v. Law Offices of Jonathan DeYoung</u>, 32 F. Supp. 2d 219, 223 (E.D. Pa. 1998) (quoting <u>Standard Venetian Blind Co. v. Am. Empire Ins. Co.</u>, 503 Pa. 300, 469 A.2d 563, 566 (Pa. 1983)). The policy must be read as a whole and construed in accordance with the plain meaning of terms.  <u>C.H. Heist Caribe Corp. v. Am. Home Assurance Co.</u>, 640 F.2d 479, 481 (3d Cir. 1981). Words of common usage must be "construed in their natural, plain, and ordinary sense, with a court free to consult a dictionary to inform its understanding of terms." <u>Melrose Hotel Co.</u>, 423 F. Supp. 2d at 495 (citing <u>Madison Constr. Co. v. Harleysville Mut. Ins. Co.</u>, 557 Pa. 595, 735 A.2d 100, 108 (Pa. 1999)).

Where the language of an insurance policy is clear and unambiguous, a court must enforce that language. <u>Med. Protective Co. v. Watkins</u>, 198 F.3d 100, 103 (3d Cir. 1999). "Furthermore, if possible, 'a court should interpret the policy so as to avoid ambiguities and give effect to all of its provisions.'" <u>Id.</u> (quoting <u>Little v. MGIC Indem. Corp.</u>, 836 F.2d 789, 793 (3d Cir. 1987)). However, if the contract's terms are reasonably susceptible to more than one interpretation, then they must be regarded as ambiguous. <u>Id.</u>; <u>C.H. Heist Caribe Corp.</u>, 640 F.2d at 481. "'Ambiguous provisions in an insurance policy must be construed against the insurer and in favor of the insured; any reasonable interpretation offered by the insured, therefore, must control.'" <u>Med. Protective Co.</u>, 198 F.3d at 104 (quoting <u>McMillan v. State Mut. Life Assurance Co.</u>, 922 F.2d 1073, 1075 (3d Cir. 1990)). Pennsylvania courts have applied this rule liberally. <u>Id.</u>

<u>American Auto. Ins. Co. v. Murray</u>, 2011 WL 3966114, at *5-6 (3d Cir. Sep. 7, 2011) (footnote omitted).

"The burden is on the insured to establish coverage under an insurance policy....  It is the insurer, however, that bears the burden of establishing the applicability of an exclusion in an insurance contract, and exclusions are always strictly construed against the insurer and in favor of the insured."  <u>Nationwide Mut. Ins. Co. v. Cosenza</u>, 258 F.3d 197, 206-07 (3d Cir. 2001)

(citations omitted). "When an insurer relies on a policy exclusion as the basis for its denial of coverage and refusal to defend, the insurer has asserted an affirmative defense and, accordingly, bears the burden of proving such defense." Madison Constr. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999).

Business Pursuits Exclusion and Occasional Basis Exception

The Policy provides up to $500,000 for "personal liability" coverage when suit is brought against an insured for damages because of a "bodily injury" caused by an "occurrence," and it includes a duty to defend. (ECF No. 39 Ex. H at 1, 17-18.) Travelers contends that it has no duty to defend or indemnify Liston with respect to the death of Dr. Jammula or the action arising out of his death because the Policy has a business pursuits exclusion and the occasional basis exception to this exclusion does not apply. Defendants respond that the occasional basis exception does apply to Liston's rentals.

Specifically, the Policy provides that:

**A. Coverage E – Personal Liability and Coverage F – Medical Payments to Others.**

Coverages E and F do not apply to "bodily injury" or "property damage":

…

2. Arising out of or in connection with a "business" conducted from an "insured location" or engaged in by an "insured", whether or not the "business" is owned or operated by an "insured" or employs an "insured". This exclusion A.2 applies to, but is not limited to, an act or omission, regardless of its nature or circumstances, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the "business".

This exclusion A.2 does not apply to:

a. The rental or holding for rental of an "insured location":

(1) On an occasional basis if used only as a residence…

13

(ECF No. 39 Ex. H at 19.)  The Policy does not define the term "occasional."

Travelers relies upon the Court of Appeals' decision in Gardner v. State Farm Fire and Casualty Co., 544 F.3d 553 (3d Cir. 2008).  In that case, Kevin Harper owned a residence where he lived from sometime in the 1980s until March 1, 2002, when he rented it to Nicole Gardner in order to maintain the mortgage on the property, while he (Harper) moved in with his girlfriend on Scott Street, around the corner from the property.  Although the initial term of the lease agreement was six months, Gardner continued to rent the property until February 1, 2003, when Harper evicted her for failure to pay the rent.  Prior to that event, however, on August 29, 2002, Gardner's mother slipped and fell on the sidewalk outside the property and was injured.

Harper had a homeowner's insurance policy with State Farm, but State Farm denied coverage for Gardner's mother's injury based on the "business pursuits" exclusion.  Gardner attempted to invoke the exception for "the rental or holding for rental of a residence of yours: (a) on an occasional basis for the exclusive use as a residence," but the district court disagreed and entered summary judgment for State Farm.  The court held that that the Occasional Basis Exception was neither ambiguous nor plainly applicable under the circumstances.  On appeal, Gardner argued that the exception was ambiguous because the rental was for the single "occasion" of Harper's attempting to get caught up on his mortgage and that it was "infrequent" and "irregular" because it occurred for just an 11-month period over more than 15 years of ownership.

The Court of Appeals rejected these arguments, concluding that they relied on:

unreasonable interpretations of the Occasional Basis Exception. First, a homeowner's rental of his property in order to finance his mortgage is nothing more than a business pursuit, which is exactly what triggers the application of the Rental Exclusion in the first place and, thus, cannot also be the "occasion" that

triggers the Occasional Basis Exception. Second, we reject the assertion that the relevant time period for assessing the infrequency or irregularity of the rental is the length of Harper's ownership rather than the term of the insurance policy, because the Policy addresses only the rental term and plainly anticipates that the norm during that term will be the insured residing at the property, not renting it out.  Thus, where, as here, the term of the policy is one year, an eleven-month rental is anything but infrequent or irregular. Accordingly, under either definition of "occasional," the Occasional Basis Exception does not apply to save [Gardner's] claim from the Rental Exclusion.

Id. at 559-60 (footnote and citation omitted).  See also Falzone v. Florida Residential Property and Casualty Joint Underwriting Ass'n, 925 So.2d 398 (Fla. App. 2006) (lease of property for virtually the entire time the insureds owned the premises does not constitute an "occasional" rental).

Defendants contend that this case is distinguishable from Gardner because it concerns a short-term rental, rather than the long-term rental that existed in that case.  They note that most of the rentals were for 2-3 nights, and the longest was an 8-night rental that occurred only one time.  (Giese Dep. at 106; ECF No. 39 Ex. F.)  They also cite Villanueva v. Preferred Mutual Insurance Co., 851 N.Y.S.2d 742 (N.Y. App. Div. 2008), in which the court held that the term "occasional" was ambiguous and thus when the insureds rented their property for five months during the ski season, this action could reasonably be interpreted as meeting the "occasional" exception to the "business purposes" exclusion.  Another court has observed that "[t]he purpose behind the 'occasional' rental exception was to allow the insured to rent his or her residence while living elsewhere temporarily, but with the intention to return there to live." State Farm Fire & Casualty Co. v. Wonnell, 533 N.E.2d 1131, 1133 (Ill. App. 1989).  In that case, the exception was not met because the owner had moved out and was trying to sell the house and had given the tenant an open-ended tenancy which lasted for at least seven months without interruption.  Here, however, Liston had not moved out and the rentals were all short-term.

15

Many of the courts that have interpreted the phrase "occasionally rented," "occasional rental" or "occasional basis" have concluded that the phrase "refers to rentals occurring now and then, such as vacation rentals." Hess v. Liberty Mut. Ins. Co., 458 So.2d 71, 72 (Fla. 1984). See also State Farm Fire & Casualty Co. v. Piazza, 131 P.3d 337, 338 (Wash. App. 2006) (an occasional rental is one in which "the circumstances of the rental [do] not negate the assumption that the homeowner is still the primary resident of the house, despite his or her temporary absence."), review denied, 149 P.3d 378 (Wash. 2006); American Family Mut. Ins. Co. v. Richardson, 517 F. Supp. 125, 128 (E.D. Mo. 1981) (rental of farmhouse was occasional because it was not rented continuously, but orally via month-to-month tenancies with no formal advertising). In those cases in which the rentals were long-term, courts have concluded that they were not "occasional." See Piazza, 131 P.3d at 338 (continuous rental of over 26 months and total absence of homeowner, who had moved to Scotland); Citizens Property Ins. Corp. v. Wise, 926 So.2d 403, 404 (Fla. App. 2006) (two-year rental with option to buy), review denied, 944 So.2d 987 (Fla. 2006). In one case, however, even two longer-term rentals were deemed "occasional" based on the circumstances. See LeCompte v. Lafayette Ins. Co., 813 So.2d 432, 436 (La. App. 2001) (leasing of property for 12-month period, then 10-month period was occasional when homeowner attempted to sell the property between these rentals).

In this case, despite Travelers' attempt to claim that the situation is identical to that presented in Gardner, there are numerous distinguishing factors. First, no one contends that Liston lacked the intention to return to the Donegal Property. In fact, he returned after each rental, cleaned the house and lived there until the next rental party was about to arrive. (Liston EUO at 58-59, 72-73; Crossland Dep. at 13, 15, 17-18; Giese Dep. at 27, 56, 76-77, 94-95.)

Second, unlike Gardner, Liston's rentals did not constitute a majority of the time, even as

measured against the Policy period of 365 days.  As Defendants note, for the first Policy period,

the Donegal Property was rented for only 42 days out of 365, or 11% of the Policy period and

during the Policy period at issue, the property was rented 69 days out of 365, or 19% of the

Policy period.  (Liston EUO at 140-41; Giese Dep. at 38, 112; ECF No. 39 Ex. F.)  Travelers

contends that, over the ten months that Liston rented the Donegal Property, from November 2008

through August 2009, he rented it to over 30 separate groups of renters, for a total rental of 148

days and 122 nights.  (ECF No. 38 at 13.)  However, as Travelers itself recognizes, the relevant

period of time to examine is the policy period and it has run the two policy periods together.  In

response to Defendants' summary of the rentals, Travelers states that it "disputes" these

conclusions because the spreadsheet speaks for itself.  However, it does not contend that the

summaries are incorrect.

Third, the rentals were all short-term.  Most of them were weekend rentals and the

longest one was eight days, which occurred only one time.  (Liston EUO at 121; ECF No. 39 Ex.

F.)  Thus, this case differs from those cited above, in which rentals lasted many months and up to

two years.

Finally, the record does not clearly indicate that Liston rented out the Donegal Property

for "business purposes."  Liston did say that he "wanted to lessen the burden of the house" and

"we figured why not rent it out periodically, you know, help pay for the mortgage and things like

that, and then just go back and forth."  (Liston EUO at 49.)  However, he did not say that renting

the property was a great way to make money, as Travelers contends.  Rather, that comment was

made by a friend of Liston's.  (Giese Dep. at 31-32.)  In any event, no one factor is dispositive,

and in this case the majority of factors weigh in favor of a finding that Liston's rental was

"occasional."  Moreover, Travelers bears the burden of demonstrating that the Policy exclusion

applies and that the exception to it does not, and it has not met its burden.

Travelers also contends that Liston "knew" that he needed a commercial policy for his rentals, but the record does not support this argument.  In November 2008, Liston notified the John Fiesta Insurance Agency that he was considering moving out of the Donegal Property and renting it to a family member who would reside there full-time starting the following month and wanted to know if he would need different insurance from what he had.  (ECF No. 39 Ex. J.) Based on the information Liston provided, the John Fiesta Insurance Agency sought insurance quotes for a Dwelling Fire policy for the Donegal Property.  A Dwelling Fire Policy is appropriate when the owner of a home does not reside at the home and the home is rented to another person on a long-term basis.  (ECF No. 39 Ex. J; Evans Dep. at 53, 66.)  The long-term rental of the Donegal Property to a family member of Liston never occurred.  (Giese Dep. at 106.)

Travelers has failed to support its argument that Liston knew he needed a commercial policy based on his rentals and it has failed to demonstrate that the occasional exception to the business pursuits exclusion does not apply.  Therefore, Travelers' motion for summary judgment based on this ground will be denied.

Insured Location

Travelers also argues that the Donegal Property was not an "insured location" under the Policy because Liston was not residing there.  Defendants respond that Liston was residing at the Donegal Property.

The Policy contains another exclusion, which provides that:

**A. Coverage E – Personal Liability and Coverage F – Medical Payments to Others.**

18

Coverages E and F do not apply to "bodily injury" or "property damage":

…

4. Arising out of a premises … that is not an "insured location"…

(ECF No. 39 Ex. H at 19.)  "Insured location" is defined as the "residence premises."  (Id. at 2

¶ 8(a).)  "Residence premises" is defined as:

a. The one family dwelling where you reside; or

b. The two, three or four family dwelling where you reside in at least one of the
family units;

and which is shown as the residence premises" in the Declarations.

"Residence premises" also includes other structure and grounds at that location.

(Id. at 3 ¶ 13.)

On the declarations page of the Policy, Liston is identified as the "named insured" and

the "residence premises" are identified as 144 Old Franklin Road, Donegal, PA 15628.  (ECF

No. 39 Ex. H at 1.)  On September 17, 2009, a Travelers investigator asked Liston for his home

address and he said "144 Old Franklin Road.  That's in Donegal, PA.  The zip code is 15628."

(ECF No. 42 Ex. R at 1.)[6]

On September 30, 2009, another Travelers investigator interviewed Liston at the Donegal

Property and asked Liston for his home address and he again answered 144 Old Franklin Road,

Donegal, PA 15628.  (ECF No. 39 Ex. Q at 1.)  In that interview, the investigator discussed both

the Donegal Property and the Bitner Road Property and asked Liston which he felt was his

primary residence.  Liston replied "I stay up here most."  (ECF No. 39 Ex. Q at 5-6.)  Liston

testified under oath that he moved into the Donegal Property immediately upon purchase in June

---

[6] ECF No. 42.

2006 and that he lived at the property "for four or five years" and that Smith resided with him at the Donegal Property roughly the same period of time until she moved to Wisconsin in September 2009 as a result of their relationship ending.  Smith did not return to Pennsylvania during the remainder of the Policy period, which ended April 15, 2010.  (Liston EUO at 38-39, 44-45.)  Smith purchased a 2009 Toyota on March 20, 2009 and listed the Donegal Property as her address on the purchase, finance and registration documents.  (Defs.' App. Exs. S, T.)  The address of 144 Old Franklin Road, Donegal, PA 15628 did not have a mailbox associated with the dwelling and therefore Liston got a Post Office box in Donegal, although a lot of his mail went directly to the clinic.  (Liston EUO at 48.)

On April 13, 2010, when asked by Travelers' attorney where he lived currently, Liston replied "144 Old Franklin Road" and stated that he had been living there without interruption since the last person had rented the house in August 2009 with the exception of a few weeks or months in January 2010 when he went to Wisconsin to try to reunite with Smith.  (Liston EUO at 117.)  Travelers states that Liston ceased living at the property sometime in 2010 but the property continues to be a vacation rental spot.  It cites the Donegal Property's website, www.backacresvacation.com.

Nevertheless, Travelers contends that, if Liston did not "reside" at the Donegal Property, then the Policy excludes the property from being the residence premises and thus from being the insured location.  Travelers cites to Liston's acts of moving out of the Donegal Property and into the Bitner Road Property when renters arrived to indicate that he did not reside at the Donegal Property.

Travelers again cites the <u>Gardner</u> case, in which the court also held that the accident did not occur at an "insured location" based on this same exclusion:

20

Harper simply was not residing at the Property at the time that [Gardner's] Mother was injured. Under Pennsylvania law, an individual's residence for purposes of an insurance policy is his "factual place of abode," which is "a matter of physical fact." Amica Mut. Ins. Co. v. Donegal Mut. Ins. Co., 376 Pa. Super. 109, 545 A.2d 343, 346 (1988). As such, when a person actually lives in one location, and sporadically visits, or keeps certain personal items at, another location, it is the location where he lives that is his residence. Id. (finding that daughter resided with mother, and not with father, when she only sporadically visited father and kept certain personal items at his home.) Here, the undisputed evidence shows that Harper was living on Scott Street with his girlfriend during [Gardner's] entire lease term. [Gardner] nevertheless argues that the Premises remained at least one of Harper's "residences" for purposes of the Policy because he "maintained a close connection with [the Property] by keeping clothing, furniture, a safe and other personal items there, keeping a key and using it to enter the [Property] frequently and without consent, receiving mail there, keeping the utility bills in his name and having the intent to return to [the Property], and actually returning there to live after [Gardner] left." (App. Br. at 20-21). However, under Pennsylvania law, these facts are irrelevant to a determination of Harper's residence. As "a matter of physical fact," he was living not at the Property but, rather, was living on Scott Street. Thus, the Property no longer qualified as an "Insured Location" under the definition of that term in the Policy, and there was no coverage under the Policy for any bodily injury that occurred there.

544 F.3d at 560. In the Amica case, the court concluded that an 18-year old student was not a "resident" of her father's household at the time of an accident she was involved in because she was residing with her mother and made only "sporadic" visits to her father's house.

Travelers contends that Liston had even fewer contacts to the Donegal Property than Harper did in Gardner because he kept only a small cache of personal supplies locked in a closet but otherwise took everything with him when renters arrived. This is a red herring: the court emphasized that the issue was that Harper was not physically living at the property because he had moved out and was living on Scott Street. By contrast, Liston had not moved out, but was living at the Donegal Property and temporarily moving his things when renters arrived. Each time renters left, he would return to clean the house and would actually live there unless and until another set of renters arrived. Nor is this case like Amica, where the individual resided at

another location.  Even Travelers does not contend that Liston spent the majority of his time at a location other than the Donegal Property.  This argument is rejected.

An appropriate order follows.

Mitchell, M.J.